IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.

| | |
|---|---|
| ZAHEEM QASIM,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION,<br><br>　　　　　　Defendant. | **COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]** |

　　　　Plaintiff Zaheem Qasim, complaining of Defendant Wells Fargo Bank, National Association, alleges and says as follows:

## PARTIES, JURISDICTION, AND VENUE

　　　　1.　　Plaintiff Zaheem Qasim (hereinafter "Plaintiff" or "Mr. Qasim") is an adult citizen and a resident of Mecklenburg County, North Carolina.

　　　　2.　　Defendant Wells Fargo Bank, N.A. (hereinafter "Defendant" or "Wells Fargo") is a national banking association that is authorized to transact business in North Carolina and maintains a place of business in Mecklenburg County, North Carolina.

　　　　3.　　This Court has personal jurisdiction over Defendant.

　　　　4.　　Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's federal claims arising under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e, *et seq.* (hereinafter "Title VII") and 42 U.S.C. § 1981.

　　　　5.　　Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental subject matter jurisdiction over Plaintiff's state claims because they are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

　　　　6.　　Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Western District of North Carolina.

1

# FACTUAL ALLEGATIONS

7. Plaintiff brings this lawsuit to seek redress based on Wells Fargo's discrimination and retaliation against him based on his race, ethnicity, and/or color, as well as based on his complaints regarding such unfair treatment. Mr. Qasim's supervisor—who was openly uncomfortable with his race, ethnicity, and/or color—subjected him to unfair treatment far worse than any of his peers. Mr. Qasim was also retaliated against after he raised concerns regarding approximately $30 million in wasteful spending on technology impacting Wells Fargo shareholders that was identified during quality assurance reviews. Defendant's wrongful treatment of Plaintiff continued, and indeed became more extreme, after Plaintiff raised concerns about his supervisor's conduct to her supervisor and to Human Resources. Ultimately, Wells Fargo's discrimination and retaliation resulted in its unlawful termination of Plaintiff's employment.

I. Plaintiff's Employment and Background

8. Plaintiff was born in Bangladesh and is ethnically South Asian.

9. Plaintiff became employed by Wells Fargo on October 18, 2021, as a Business Execution Director. In that role, Plaintiff managed an eleven-member team who helped deliver governance and oversight of customer tax across Wells Fargo. His role and responsibilities were well-defined and connected to addressing a high rated Audit issue at Wells Fargo.

10. Plaintiff's role included partnering with Wells Fargo business partners in Control, Utilities, Group Tax Leaders, Operational Risk, and Tax Information Reporting Compliance ("TIRC")—all of whom consistently provided Plaintiff positive feedback.

11. Plaintiff adhered to all Wells Fargo policies, procedures, and regulatory guidelines pertinent to his role. His team was also very successful in meeting goals and expectations, including goals that were set before he even began working for Wells Fargo.

12. During Plaintiff's employment, he reported to Johanne Hawk, also a Business Execution Director with Wells Fargo ("Ms. Hawk"). Ms. Hawk, in turn, reported to Jim Texter, Head of Operations Utilities ("Mr. Texter").

13. During Plaintiff's employment, his role included navigating a high-rated Corporate Audit ("Audit") issue within the organization.

14. That included the strategy and execution (which were determined prior to Plaintiff's employment with Wells Fargo) for the 2022 Target Operating Model ("TOM") as a primary vehicle for delivering governance and oversight of customer tax across Wells Fargo.

15. In connection therewith, Plaintiff informed Ms. Hawk of four potential issues with the TOM, including that: (1) the Quality Assurance ("QA") process was cumbersome, (2) all metrics should not go live in 1Q as scheduled because they would fail validation by Corporate Audit as they were, (3) the Payment Matrix tool was not scalable to support all five lines of business, and (4) a lot of the governance workstreams did not operationalize a repeatable business

2

process. Ms. Hawk ignored Plaintiff's feedback and insisted he complete the objectives as they were.

16. In late 2021, Plaintiff and his team made substantive efforts to identify a solution to the TOM issue. In March 2022, Ms. Hawk stated that the metrics were not moving fast enough. To address her concerns, Mr. Qasim provided details on the data issues and reminded her that one quarter was not enough time because TIRC still could not resolve the same data challenges even after three years running the same business process. Ms. Hawk then began punishing Mr. Qasim for the consequences that resulted from not implementing his suggestions.

17. Ms. Hawk's attitude towards Mr. Qasim worsened in May 2022. At that time, Mr. Qasim also told Ms. Hawk that they needed to focus on the technology and software, since the pertinent software was having issues, including but not limited to tax reporting issues.

18. Mr. Qasim also raised concerns regarding Ms. Hawk's wasteful spending of approximately $30 million on the technology. He also believed Ms. Hawk was misleading others about the inherent risks with the technology/software's performance and risks to Wells Fargo.

19. Also in May 2022, Ms. Hawk told Mr. Qasim that QA reviews should be done in one month. Mr. Qasim told her that a major change in strategy was needed to meet her expectations and presented an alternative approach.

20. Ms. Hawk rejected Mr. Qasim's alternative approach and other concerns and told him to speak with Chris Chapman, Director of QA ("Mr. Chapman"), for guidance.

21. As instructed, Mr. Qasim met with Mr. Chapman, who agreed that Ms. Hawk's expectations for Mr. Qasim were not realistic and gave Mr. Qasim advice on an alternative solution, similar to the one Mr. Qasim had previously proposed to Ms. Hawk.

22. Ms. Hawk was still not satisfied, and then told Mr. Qasim to ignore everything Mr. Chapman told him, even though Mr. Chapman was the Director of QA. Ms. Hawk insisted that Mr. Qasim follow her directions instead, which were clearly impossible to meet.

23. In July 2022, Mr. Qasim had his midyear review with Ms. Hawk. During such review, Ms. Hawk stated that she only received a "Meets" in her own midyear review and was not happy about it. Ms. Hawk blamed Mr. Qasim for her not receiving higher marks, and as a result, she unfairly graded Mr. Qasim at "Inconsistent Meets."

24. Contrary to Ms. Hawk's review, Mr. Qasim continued to receive excellent feedback from their business partners. When asked, Ms. Hawk could not reconcile the feedback from the business partners with her own review of Mr. Qasim's work. Instead, she blamed her own failures on Mr. Qasim alone and not any other of her subordinates, even though there was no rational explanation for singling Mr. Qasim out.

25. Thereafter, Mr. Qasim continued to try and meet Ms. Hawk's unrealistic expectations and goals. Ms. Hawk was also hostile towards Mr. Qasim for following objectives

set prior to his hiring. She did not treat his peers that way, and there was no legitimate performance-related reason for this disparate treatment towards Mr. Qasim.

26. In September 2022, Ms. Hawk and her leadership team (including Mr. Qasim) met with Mr. Texter to review progress on key 2022 deliverables. After Mr. Qasim provided his updates, Mr. Texter stated that "I know governance is strong in Tax, so I have no concerns." Ms. Hawk also did not raise any concerns about Mr. Qasim or his performance in this meeting.

27. On October 26, 2022, Mr. Qasim submitted a "6-word race card statement" as part of an upcoming Diversity, Equity, and Inclusion ("DEI") programming event. His statement said, "I'm fully confident in my team."

28. Ms. Hawk reached out to Mr. Qasim about his statement and excessively questioned him about his wording and asked for clarification about how he chose his words. She said that his words "didn't align with what others were saying." Ms. Hawk berated Mr. Qasim about his statement, and appeared to be searching for a negative motive to discourage him from sharing his experiences related to diversity. She also seemed uncomfortable with Mr. Qasim participating in the DEI event. Mr. Qasim told her to remove him from the agenda if she was not comfortable with him expressing his statement or discussing his race. Eventually, she ceased her interrogation and allowed Mr. Qasim to participate in the event.

29. In early November 2022, Mr. Qasim participated in and passed Defendant's Risk Control and Self-Assessment ("RCSA") review without issue. RCSA has been a top priority for Wells Fargo for the past few years. During that five-week session, Mr. Qasim meticulously presented an exhaustive overview of his responsibilities, progress throughout 2022, inherent and residual risks, compliance requirements, and instances of risk. The discussions were before an audience of over 25 participants, including RCSA team members, PWC consultants, Control, Operational Risk, Compliance, and Second Line of Defense. Throughout those comprehensive sessions, not a single participant raised a credible challenge concerning Mr. Qasim's performance for not meeting expectations.

30. Notably, Ms. Hawk never used any of the aforementioned (or other) major forums to raise her alleged concerns with Mr. Qasim's performance. If there were legitimate concerns with Mr. Qasim's job performance, they would have been identified and addressed during these forums.

II. Plaintiff's Complaints and Defendant's Discrimination and Retaliation.

31. Based on Ms. Hawk's continued wrongful conduct, Mr. Qasim reached out to Mr. Texter—Ms. Hawk's superior—on October 23, 2022, out of concern for the harassment, disparate treatment, retaliation, and malicious behavior he endured from Ms. Hawk, as well as the financial improprieties he identified. Mr. Texter was a Senior Executive (Head of Utilities Operations) and reported three levels down from Defendant's Chief Executive Officer Charlie Scharf.

32. Mr. Qasim met with Mr. Texter on October 25, 2022, and also sent Mr. Texter a one-page summary that outlined claims against Ms. Hawk and a timeline of events that led to this

escalation between Plaintiff and Ms. Hawk. That meeting unfortunately only lasted approximately five minutes, and Mr. Texter did not review the summary Mr. Qasim prepared.

33. Mr. Texter said he would follow up with Mr. Qasim. Upon information and belief, neither Mr. Texter nor Human Resources made any effort to correct or investigate Ms. Hawk's behavior towards Mr. Qasim. As a result, Ms. Hawk continued to unfairly single Mr. Qasim out and treat him differently than his co-workers without any work-related reason.

34. On November 21, 2022, Mr. Qasim received an unwarranted informal warning from Ms. Hawk. This warning lacked any merit considering Mr. Qasim passed RCSA three weeks earlier and came shortly after his meeting with Mr. Texter in October wherein he raised concerns about hostility in the workplace and financial issues, and after Ms. Hawk expressed her discomfort with Mr. Qasim sharing his experiences with diversity and discussing his race.

35. In that warning, Ms. Hawk listed some minor infractions and purported to inflate them up to large mistakes. Indeed, Ms. Hawk unfairly generalized his overall performance based on tiny infractions that were either quickly resolved or that were inaccurate or never happened at all. Mr. Qasim asked why he was receiving a warning. Ms. Hawk could not provide any legitimate performance-related justifications for the warning.

36. At the end of the meeting, Ms. Hawk said "Be careful who you talk to. You shouldn't share issues we are having and try to undo everything I have in place." Mr. Qasim asked her to clarify to whom she was referring or about what issues might have been shared, but Ms. Hawk refused to respond.

37. Mr. Qasim's informal warning was punishment for speaking with Mr. Texter. The warning occurred after he tried to escalate his concerns with Ms. Hawk's behavior and financial issues to Mr. Texter. Ms. Hawk's purported reasons for the warning were simply a haphazard list of perceived errors Mr. Qasim had arguably made over the course of months, in an effort to legitimize the improper warning. Ms. Hawk's statements at the end of the meeting clearly suggest that she created this informal warning to discourage Mr. Qasim from raising concerns regarding her unfair treatment and escalating the financial misconduct of $30 million wasteful spending related to technology.

38. On or about November 29, 2022, Mr. Qasim again contacted Mr. Texter to discuss Ms. Hawk's retaliatory and threatening behavior. Despite Wells Fargo's insistence that it "is committed to providing team members with a prompt and thorough review of a work-related problem," Mr. Qasim had not heard from Mr. Texter for over a month, even though Mr. Texter promised to follow up with Mr. Qasim.

39. On December 1, 2022, Mr. Qasim finally met with Mr. Texter again. Before Mr. Qasim could say anything, Mr. Texter stated that the "hostile work environment claim" was already investigated and the "ticket" was closed by Human Resources, thus, Ms. Hawk's behavior could not have been problematic, and that the issues with Ms. Hawk must have been related to Mr. Qasim's performance.

40. However, Mr. Qasim told Mr. Texter that he had not opened a ticket with Human Resources and did not know what he was referring to. Mr. Qasim also emphasized that his performance reviews from Ms. Hawk did not match the positive feedback he consistently received from business partners or from the tasks he had accomplished.

41. Mr. Qasim also told Mr. Texter that he felt there was a hostile work environment and that he was being subjected to disparate treatment and punished for raising concerns. Mr. Qasim further stated that he felt that Ms. Hawk retaliated against him for speaking with Mr. Texter in October.

42. Mr. Texter suggested that he mediate a performance review between Mr. Qasim and Ms. Hawk. Mr. Qasim declined due to the collusion witnessed (e.g., repeating Ms. Hawk's talking points that lacked any merit) and told him that he feared that would cause more harm and additional retaliatory behavior from Ms. Hawk. Mr. Texter offered no other advice other than to say Mr. Qasim should contact Human Resources if he felt his concerns were not being addressed.

### III. Plaintiff's Escalation of his Complaint and Further Retaliation.

43. On December 5, 2022, Mr. Qasim opened a ticket with Wells Fargo's EthicsLine about Ms. Hawk's behavior towards him.

44. The next morning (December 6, 2022), Mr. Qasim arrived at his office at 7:30am to find Ms. Hawk standing outside his office waiting for him. It was highly unusual for Ms. Hawk to be at Mr. Qasim's office that early in the morning.

45. Ms. Hawk entered Mr. Qasim's office under the pretense of wanting to discuss a team member's meeting minutes notes, but then immediately pivoted to scolding Mr. Qasim for a random and irrelevant email he sent her three weeks prior. During the discussion, Ms. Hawk repeatedly twisted the words of each of Mr. Qasim's responses and became very hostile and upset towards him.

46. Mr. Qasim stated that he was uncomfortable and repeatedly asked her to leave his office, but she continued to harass him. Eventually Ms. Hawk said: "I don't care that you spoke with [Mr. Texter]" and she left his office.

47. This incident occurred the morning after Mr. Qasim formally raised concerns to Human Resources and within a week of his second meeting with Mr. Texter. Ms. Hawk intended to threaten Mr. Qasim and discourage him from reporting the discrimination and retaliation he was experiencing. She made it clear that she knew about meetings and complaints that should have been confidential.

48. Upon information and belief, Ms. Hawk was suspended for two days for her December 6, 2022 conduct. However, no mitigating controls were put in place, and Ms. Hawk's conduct continued undeterred.

6

49. On December 19, 2022, Mr. Qasim met with Human Resources to discuss his complaint. Mr. Qasim told Human Resources that Ms. Hawk uses fear, intimidation, and retaliation to silence feedback, and also tries to defend her unfair treatment using petty and minor mistakes. Mr. Qasim reiterated his concerns that she purposely created unrealistic and unattainable goals for Mr. Qasim to ensure he performed poorly, and that she did not subject his peers to these unrealistic goals or unfair treatment.

50. Mr. Qasim's 2022 year-end review with Ms. Hawk was scheduled for one hour on January 26, 2023. However, Ms. Hawk unexpectedly rescheduled the meeting for 30 minutes on January 25, 2023, without first sending him her write-up. At the meeting's outset, Mr. Qasim requested a copy and chance to review it, but Ms. Hawk refused, leaving Mr. Qasim unprepared to discuss her latest barrage of unfair feedback.

51. That feedback included criticizing Mr. Qasim for following the strategy that was in place prior to his hiring. Ms. Hawk also scolded him for problems that he brought to her months prior, which she ignored and failed to address. At no point did Ms. Hawk raise any legitimate concerns with Mr. Qasim's performance.

52. On January 27, 2023, Mr. Qasim opened a new ticket with Human Resources to dispute his year-end review. Therein, he described how Ms. Hawk unfairly surprised him with the meeting and refused to let him prepare, and out how she continued to critique him for following a strategy that was put in place before his employment began and thus out of his control.

IV. <u>Plaintiff's EEOC Charge of Discrimination and Defendant's Further Retaliation and Wrongful Termination of Plaintiff's Employment.</u>

53. On February 3, 2023, Mr. Qasim informed Human Resources that he was filing a Charge of Discrimination with the EEOC.

54. Then, on February 8, 2023, Ms. Hawk informed Mr. Qasim that he would be losing two workstreams, effective the following week.

55. Plaintiff filed his Charge of Discrimination with the EEOC against Wells Fargo on February 9, 2023, Charge No.: 430-2023-01498.

56. On February 21, 2023, Mr. Qasim contacted Human Resources again and sought help to protect himself from future retaliation, as Ms. Hawk indicated to him that she had seen his prior submissions to Human Resources.

57. However, Human Resources, just like Mr. Texter, did not do anything to address Ms. Hawk's behavior. Indeed, Ms. Hawk continued to harass, intimidate, and use confidential information against Ms. Qasim that had been submitted to Human Resources.

58. From on or about March 1, 2023, through June 2, 2023, Ms. Hawk was out on a leave of absence. During that time, Mr. Qasim's performance remained satisfactory and no concerns were raised by any interim manager or senior leader.

59. After Ms. Hawk returned from her leave of absence, she did not raise any performance issues or offer any concerns about the accomplishments captured in Mr. Qasim's June 2023 midyear self-assessment.

60. Nevertheless, shortly after returning from her leave, Ms. Hawk terminated Mr. Qasim's employment via telephone on July 7, 2023, using numerous false statements that contradicted Wells Fargo policies (none of which were identified during escalation paths at Wells Fargo). Neither Human Resources, nor anyone else, were parties to that call.

61. For most of Mr. Qasim's employment with Wells Fargo, Ms. Hawk unfairly subjected him to treatment far worse than any of his peers. Ms. Hawk claimed that her behavior was related to his performance, yet her assertions contradicted issue management policy and RCSA that governed and provided oversight for his role from business partners.

62. Ms. Hawk also made it clear that she was uncomfortable with Mr. Qasim's race, color, and/or ethnicity as she grilled and berated him about what he planned to share at the DEI event.

63. Even though Mr. Qasim met with Mr. Texter on multiple occasions and opened a ticket with Human Resources, nothing was done to address Ms. Hawk's behavior. Additionally, Ms. Hawk's behavior towards him became even more severe after he raised concerns about her behavior to Mr. Texter and to Human Resources. Each time Mr. Qasim sought outside help or advice, Ms. Hawk punished him with unfair reviews or appeared in his office and verbally harassed him.

64. Ms. Hawk also stated to Mr. Qasim that she saw everything that was submitted to Human Resources. She repeated confidential information provided by Mr. Qasim during each escalation path. Ms. Hawk also implied on numerous occasions she was well connected at Wells Fargo and had the ability to influence what Human Resources investigated. She further told Mr. Qasim that she is a "GSD" Executive, which she said stood for "Get Sh*t Done"; that Human Resources rules do not apply to her; that Mr. Qasim should stop going to Mr. Texter and Human Resources; and that he should be careful who he messed with.

65. Wells Fargo's discriminatory and retaliatory actions have not only cost Mr. Qasim his job, but also considerable hardship and emotional impact, further increasing his damages.

66. Mr. Qasim believes that he was not the only employee to complain of unfair and/or harassing treatment by Ms. Hawk. Human Resources and Mr. Texter were complicit in Ms. Hawk's behavior, even after Mr. Qasim raised concerns about unfair, discriminatory, and retaliatory treatment on multiple occasions.

67. Following Plaintiff's wrongful termination, he filed an Amended Charge of Discrimination on September 9, 2023 (the Charge and Amended Charge are hereinafter jointly referred to as the "Charge of Discrimination").

68. The EEOC investigated Plaintiff's Charge of Discrimination, and Wells Fargo submitted a Position Statement and Supplemental Position Statement.

69. On April 29, 2024, the EEOC issued its Determination and Notice of Rights. Plaintiff now timely brings his claims.

70. All conditions precedent to Plaintiff filing this lawsuit have either been met or waived by Defendant.

## FIRST CLAIM FOR RELIEF
**[Discrimination of on basis of race, color, and/or ethnicity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.*]**

71. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

72. Plaintiff belongs to a class of persons protected under Title VII of the Civil Rights Act of 1964.

73. Defendant engaged in unlawful intentional discrimination against Plaintiff with respect to the treatment and conditions of his employment.

74. Plaintiff's race, color, and/or ethnicity was a motivating factor in the Defendants' decisions to discriminate and take adverse employment action against Plaintiff.

75. Plaintiff's job performance was satisfactory.

76. Plaintiff suffered different treatment from similarly-situated employees outside of his protected class.

77. Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

78. There is a causal link between Plaintiff's race, color, and/or ethnicity and Defendant's discrimination.

79. As a direct and proximate result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial, with such damages including at least lost wages, future lost earnings, and other compensatory damages.

80. Defendant's discrimination was also malicious, intentional, willful, and done with a reckless and wanton disregard for Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, in an amount to be determined at trial, sufficient to punish Defendant for its wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

## SECOND CLAIM FOR RELIEF
### [Retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.*]

81. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

82. Plaintiff belongs to a class of persons protected under Title VII of the Civil Rights Act.

83. Plaintiff engaged in protected activities to preserve his rights under 42 U.S.C. §§ 2000e, *et seq.*, including, *inter alia*, complaining about the discrimination and retaliation he experienced and filing an EEOC Charge of Discrimination.

84. Defendant intentionally committed adverse employment actions in retaliation for these protected activities, including and up to terminating his employment.

85. There is a causal link between Plaintiff's engaging in protected activities and Defendant's adverse employment action.

86. Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

87. As a direct and proximate result of Defendant's actions, Plaintiff has been damaged in an amount to be determined at trial, with such damages including at least lost wages, future lost earnings, and other compensatory damages.

88. Defendant's retaliation was also malicious, intentional, willful, and done with a reckless and wanton disregard for Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, in an amount to be determined at trial, sufficient to punish Defendant for its wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

## THIRD CLAIM FOR RELIEF
### [Wrongful Discharge in Violation of Public Policy]

89. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

90. Pursuant to the Equal Employment Practices Act, "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2(a).

91. As described above, Plaintiff was discriminated and retaliated against, and ultimately terminated, in violation of this public policy.

92. Plaintiff engaged in protected activities, including but not limited to making complaints based on discrimination and retaliation, and by filing his Charge of Discrimination.

93. Defendant took adverse actions against Plaintiff, including but not limited to terminating his employment.

94. A causal connection exists between Plaintiff's protected activities and the adverse actions he suffered.

95. Defendants' wrongful termination of Plaintiff was done intentionally and willfully. That is, Defendant wrongfully discharged Plaintiff for an unlawful reason and/or purpose that contravenes the public policy stated in the Equal Employment Practices Act.

96. Defendant employed more than 15 employees at all relevant times.

97. As a result of Defendant's wrongful discharge of Plaintiff in violation of public policy, Plaintiff is entitled to recover as damages at least based on lost wages, future lost earnings, emotional distress damages, and other compensatory damages.

98. As a direct and proximate result of Defendant's wrongful discharge in violation of public policy, Plaintiff has suffered damages in an amount to be determined at trial.

99. Defendant's wrongful discharge was also malicious, intentional, willful, and done with a reckless and wanton disregard for Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, in an amount to be determined at trial, sufficient to punish Defendant for its wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

## FOURTH CLAIM FOR RELIEF
**[Negligent Supervision and Retention]**

100. Plaintiff restates and realleges the allegations contained above as if fully set forth herein.

101. Defendant owed Plaintiff a duty to exercise ordinary and reasonable care in the training, retention, supervision, and discipline of its employees, and to protect Plaintiff and other employees from discrimination and retaliation by his supervisors, including at least Ms. Hawk.

102. Defendant breached such duties.

103. Specifically, as alleged above, Defendant failed to properly supervise and retain Ms. Hawk, such that she was allowed to continue her pattern of discrimination and retaliation, which ultimately resulted in her improper termination of Plaintiff's employment.

104. Further, upon information and belief, Defendant had prior knowledge of Ms. Hawk's previous unlawful harassment and retaliation against Plaintiff and various other employees.

105. As a direct and proximate result of Defendant's negligent retention and supervision, Plaintiff has suffered damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### [Race Discrimination in violation of 42 U.S.C. § 1981]

106. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if fully set forth.

107. Plaintiff belongs to a class of persons protected under 42 U.S.C. § 1981.

108. Defendant engaged in unlawful intentional discrimination against the Plaintiff with respect to the benefits, terms, privileges, and conditions of his employment.

109. Plaintiff's race was a motivating factor in Defendant's decisions to take adverse action against him.

110. As a result of Defendant's actions, Plaintiff has been injured and is entitled to compensatory damages. Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

111. Defendant's discrimination was also malicious, intentional, willful, and done with a reckless and wanton disregard for Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, in an amount to be determined at trial, sufficient to punish Defendant for its wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

## SIXTH CLAIM FOR RELIEF
### [Retaliation in violation of 42 U.S.C. § 1981]

112. Plaintiff repeats, realleges, and incorporates the preceding paragraphs as if fully set forth.

113. Plaintiff belongs to a class of persons protected under 42 U.S.C. § 1981.

114. Plaintiff engaged in protected activities to preserve his rights under 42 U.S.C. § 1981, including, *inter alia*, filing an EEOC Charge of Discrimination.

115. Defendant intentionally committed adverse employment actions in retaliation for these protected activities, including, *inter alia*, terminating Plaintiff's employment.

116. As a result of Defendant's actions, Plaintiff has been injured and is entitled to compensatory damages.

117. Defendant acted with malice and/or with reckless indifference to Plaintiff's federally protected rights.

118. Defendant's retaliation was also malicious, intentional, willful, and done with a reckless and wanton disregard for Plaintiff's rights. Plaintiff is therefore entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*, in an amount to be determined at trial, sufficient to punish Defendant for its wrongful conduct and to deter such conduct in the future by Defendant and others similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court for the following relief against Defendant:

1. That the Court award Plaintiff damages against Defendant based on Defendant's violations of Title VII, violations of 42 U.S.C. § 1981, wrongful discharge in violation of public policy, and negligent supervision and retention in an amount to be determined at trial, plus interest;

2. That the Court award Plaintiff punitive damages against Defendant pursuant to N.C. Gen. Stat. §§ 1D-1, *et seq.*;

3. That the Court award Plaintiff his reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988(b), and all other applicable law;

4. That the Court tax the costs of this action against Defendant;

5. That all issues triable by a jury be so tried; and

[Remainder of page intentionally blank]

6. For all other relief, both legal and equitable, which the Court deems just and proper.

This the 26th day of July, 2024.

**JAMES, McELROY & DIEHL, P.A.**

　　s/ John R. Buric
John R. Buric, N.C. State Bar No. 22688
John R. Brickley, N.C. State Bar No. 41126
525 N. Tryon Street, Suite 700
Charlotte, North Carolina 28202
Telephone: (704) 372-9870
Facsimile: (704) 333-5508
Email: jburic@jmdlaw.com
　　　　jbrickley@jmdlaw.com
*Attorneys for Plaintiff*